## IN RE TAXES ONOMEA SUGAR COMPANY.

### No. 1230.

CROSS-APPEALS FROM TAX APPEAL COURT FOURTH CIRCUIT.

## IN RE TAXES PAAUHAU SUGAR PLANTATION COMPANY.

## IN RE TAXES HONOKAA SUGAR COMPANY, LIMITED.

### NOS. 1231 AND 1232.

APPEALS FROM TAX APPEAL COURT FOURTH CIRCUIT.

## IN RE TAXES HUTCHINSON SUGAR PLANTATION COMPANY.

### No. 1235.

CROSS-APPEALS FROM TAX APPEAL COURT THIRD CIRCUIT.

SUBMITTED DECEMBER 26, 1919.　　　　DECIDED JANUARY 23, 1920.

COKE, C. J., KEMP, J., AND CIRCUIT JUDGE FRANKLIN IN PLACE OF EDINGS, J., ABSENT.

TAXATION—*equalization of assessments.*

> An assessment cannot be reduced on appeal merely because property in another division has been assessed lower in comparison—the assessor having acted in good faith and the assessment not being in fact an overvaluation of the property in question.

SAME—*full cash value.*

> Full cash value of a piece of property is what it would sell for when sold in the manner such property is usually sold.

SAME—*same.*

> If property is not salable its value is what it would sell for if salable.

SAME—*enterprise for profit—growing crops.*

In estimating the value of growing crops of cane as personal property, which combined with other property constituted the basis of an enterprise for profit, it is proper to consider the quantity and price of the sugar which said crops are expected to yield.

SAME—*same—same.*

Under normal conditions when the price of sugar on January 1 might not be the price at which it would sell throughout the year it would be proper to consider the average price which could be expected over a period of years in estimating the value of the crop for that year, but where, as was the case on January 1, 1919, the price for that crop had been fixed, the fixed price should govern in making the estimate of the value of the crop as a separate item of property.

SAME—*same—taxable assets—value.*

The net value of a piece of property is to be ascertained by allowing a proper amount for depreciation from year to year so that when the property is worn out and discarded the depreciations allowed will equal the original cost. The net value thus ascertained represents the true value for the purpose of taxation.

SAME—*weight of decision of tax appeal court.*

A decision of the tax appeal court though not having the conclusiveness of a jury verdict should not be disturbed for light reasons.

OPINION OF THE COURT BY KEMP, J.

These several cases come before this court upon appeals from the judgments of the tax appeal courts. The Onomea, Paauhau and Honokaa cases were heard by the tax appeal court for the fourth judicial circuit and the Hutchinson case by the tax appeal court of the third judicial circuit. The taxpayer's valuation, the assessor's valuation and the tax appeal court's valuation in the several cases follow:

Onomea Sugar Company

| | |
|---|---:|
| Taxpayer's valuation ................. | $3,400,000 |
| Assessor's valuation ................... | 4,250,000 |
| Tax Appeal Court's valuation ......... | 4,045,117 |

Hutchinson Sugar Plantation Company
  Taxpayer's valuation ................. $1,460,000
  Assessor's valuation .................. 1,750,000
  Tax Appeal Court's valuation ......... 1,575,000

Paauhau Sugar Plantation Company
  Taxpayer's valuation ................. $ 750,000
  Assessor's valuation .................. 1,250,000
  Tax Appeal Court's valuation ......... 1,250,000

Honokaa Sugar Company, Limited
  Taxpayer's valuation ................. $ 475,000
  Assessor's valuation ................. 700,000
  Tax Appeal Court's valuation ......... 700,000

In the Onomea Sugar Company and the Hutchinson Plantation Company cases both the taxpayers and the assessors have appealed. In the other cases only the taxpayers have appealed.

The statutory provisions which it will be necessary for us to consider in these cases are contained in sections 1240 and 1241 of the Revised Laws as amended by Act 222 S. L. 1917, and are as follows:

"Section 1240. Personal property defined. The term 'personal property,' for the purposes of this chapter, shall mean and include all household furniture and effects, jewelry, watches, goods, chattels, wares and merchandise, machinery, ships or vessels, whether at home or abroad, all moneys in hand, rights of piscary (leasehold and chattel interests in land and real property solely acquired prior to the passage of this Act), franchises, patents, contracts, growing crops and all animals not in this chapter specifically taxed."

"Section 1241. Basis of value for taxation. All real and personal property and the interest of any person in any real or personal property shall be assessed separately as to each item thereof for its full cash value.

"Land shall be equally assessed, according to its value for use or occupancy; this value shall be determined in cities and towns wherever else practicable, by the Somer's

system or other means of exact computation from central locations.

"Provided, however, that in all cases where real and personal property, or several classes or kinds or parcels of real or personal property respectively, are combined and made the basis of an enterprise for profit, the combined property forming such basis of such enterprise for profit, shall be assessed as a whole on its fair and reasonable aggregate value.

"In estimating the aggregate value of such enterprise for profit, there shall be taken into consideration the net profits made by the same, also the gross receipts and actual running expenses; and where it is a company being a corporation whose stock is quoted in the market, the market price thereof, as well as all other facts and considerations which reasonably and fairly bear upon such valuation.

"In ascertaining the aggregate value of the property constituting the basis of an enterprise for profit for the purpose indicated by this section, there shall first be included all property combined and forming the basis of such enterprise whether within the definition of real or personal property set forth in this chapter or not, and there then shall be deducted therefrom the value of shares in other Hawaiian corporations, held or owned by such enterprise, the value of all property on which specific taxes are levied and the value of all property that would not be taxable if not so combined and made the basis of an enterprise for profit."

The assessment in each case is of an enterprise for profit and is to be governed by the rules laid down in the above statute for taxing an enterprise for profit as distinguished from the taxation of separate items of real and personal property.

The four cases were by agreement of the parties and with the consent of the court briefed and submitted together and will all be disposed of in one opinion.

At the outset the taxpayers in their brief assert the belief that these appeals constitute the most important tax

cases that have come before this court since the decision in the leading case on the subject of taxation of plantation property in 1897 and reported in 11 Haw. 235. They further state that one of the objects of these appeals is to obtain an authoritative ruling as to whether the principles which were exhaustively, yet concisely laid down in the leading case referred to, most of which have been reaffirmed in later decisions by this court, are to continue to control the assessment of sugar plantation properties. We fully appreciate the importance of the leading case above as a precedent in cases of this kind and have no intention of departing from the principles laid down therein. But counsel must be aware of the fact that this one case does not, and could not be expected to, announce the whole law upon the subject of taxation of an enterprise for profit. This court in many other well considered cases has announced other and additional rules not in conflict with, but more specific than, the general rules therein announced which we think to be of quite as much importance and entitled to the same consideration from us.

The first subject discussed by the taxpayers in their very exhaustive brief is that of equalization of assessments throughout the Territory. They point out that the evidence adduced in these cases before the tax appeal courts shows that this year's assessments on sugar plantations upon the basis of the capitalization of profits on the Island of Oahu are at the average rate of 22.65 per cent.; on the Islands of Maui and Kauai between 18 and 19 per cent., while on Hawaii the assessments are at the average rate of 16.38 per cent., in each case the figures being based on a four-year average of profits.

The taxpayers recognize the fact that plantations on the different islands and different plantations on the same island are, because of various circumstances affect-

ing their valuation, not to be valued solely by the method of capitalization of profits but that all the circumstances having a reasonable bearing upon their valuation are to be considered. It is also true, we think, that the method of comparison of assessments resorted to in this case is practically useless. In fact we doubt that such comparisons should be considered at all in cases such as these because all of the facts which would properly influence the various assessors in making their assessments have not been shown. But even if there has been a discrimination against the plantations on Hawaii in the matter of valuation when compared with plantations on the other islands this fact does not afford a reason for reducing the assessments if they have been made in good faith and do not in fact constitute an overvaluation of the property in question. It has been held by this court in several cases that a proper assessment cannot be reduced on appeal merely because other property in the vicinity has been assessed too low in comparison—the assessor having acted in good faith and not having assessed other property in general at a lower rate. *Chilton* v. *Shaw*, 13 Haw. 250; *Re Taxes Catholic Mission*, 22 Haw. 764. Certainly if the fact that the same assessor has assessed other property at a lower rate as shown in the cases above cited would not authorize a reduction of the assessment appealed from then the fact that the assessor of another division has assessed property in his division at a lower rate should not affect the assessments here appealed from if they have been made in good faith and do not in fact constitute an overvaluation of the properties in question. There is nothing before us to show that the assessments involved in these appeals have not been made in good faith. It should, and will, therefore, be our endeavor to test the valuation of the several properties

involved by the rules laid down in the statute and the many decisions of this court.

There has been a contention put forth in behalf of the taxpayers by witnesses called in their behalf that the mature and growing crops of cane upon these plantations have no value. The reasoning is that under the circumstances surrounding these plantations the crops could not be manufactured into sugar by any one other than the plantation owning the mill and that because of this fact, considered as separate items of property, they could not be sold and therefore have no value and should not be considered in arriving at a valuation of the tangible assets or that at most the expected profits from said crops are the highest value that should be considered.

Property is to be assessed at its full cash value. (Sec. 1241 *supra*.) This court has held that full cash value means the value for purposes of sale if the property is salable, or if not, what it would be worth if salable. (*Re Taxes of James B. Castle*, 15 Haw. 1.) If the taxpayers' contention that the crops of these plantations could not be sold is correct then some test other than the salable value must be resorted to. It is a well known fact that fairly accurate estimates of the yield of each crop are made by plantation managers before tax return time and the managers' estimates for the crops on the plantations here involved have been given in evidence. The price of sugar on January 1, 1919, had been fixed by the government for the 1919 crop and the cost of converting a standing crop into sugar and marketing the product as well as the cost of finishing any immature crops could be forecast with reasonable accuracy so that if a crop were salable its value for the purposes of sale could be reasonably ascertained and we think this value is the thing to be considered in arriving at the value of the tangible assets. In ascertaining the aggregate value of

the property constituting the basis of an enterprise for profit the statute prescribes that there shall first be included all property combined and forming the basis of such enterprise whether within the definition of real or personal property or not and there shall be deducted therefrom the value of shares in other Hawaiian corporations held or owned by such enterprise, the value of all property on which specific taxes are levied and the value of all property that would not be taxable if not so combined and made the basis of an enterprise for profit. (Sec. 1241 *supra.*) Section 1240, above quoted, includes growing crops in the definition of personal property. Upon the authority of this statute alone the contention that the growing crops should not be considered is untenable, besides this court has always taken the value of such crops into consideration in estimating the value of tangible assets.

Neither do we think that there is any merit in the contention that the profit which will be made from a crop is the sole criterion of its value upon a given date. Let us suppose that on the first day of January, the date as of which the values are to be fixed, there has been expended upon a crop the sum of $200,000; that it will require an additional $200,000 to bring the crop to maturity, harvest and mill and market it; that when so placed upon the market at the price of sugar on January 1 it would bring, if the yield equaled the estimate, $600,000. According to the theory of counsel the crop would possess a value of only $200,000 on January 1 while it is clear that its value would be $400,000 less a reasonable allowance for the use of the money necessary to finish the crop and place the product upon the market. Again, let us suppose that on January 1 a ranchman has a bullock which he has raised at an expense of $50; that it will cost him $10 to sell the bullock which when so sold will bring a

gross return to the ranchman of $100. According to the theory advanced the bullock would be worth only $40 because that is all the profit the ranchman would make but it is perfectly clear that the bullock was worth $90. We think that in this connection it should be borne in mind that in estimating the value of the different items of property which form the basis of an enterprise for profit we are not considering the value of the enterprise but are undertaking to ascertain the value of the different items separately as one of the things to be considered in connection with all other matters having a bearing upon the enterprise as a whole and that when so considered the enterprise may be found to have a value more or less, according to the circumstances of each case, than the aggregate value of the parts constituting the whole. It is true, as this court has several times said, that the value of the whole will not be less than the aggregate value of the parts unless by reason of their combination the value of the parts has depreciated. *Re Taxes Union Mill Co.*, 23 Haw. 46; *Re Taxes Waiakea Mill Co.*, 24 Haw. 333.

Counsel for the taxpayers have emphasized the fact that conditions brought about by the recent great war have cast new and great burdens upon the sugar industry. It is true that the cost of almost everything, such as labor, material, freight rates and taxes has advanced as a result of the war and all of these things must be considered in arriving at the valuation of a business enterprise. But the effects of the war upon the industry were not all of this character. Prior to January 1, 1919, the price of the 1919 crop of sugar had been fixed and assured at $145.60 per ton, an advance of more than $25 per ton over the price prevailing for the 1918 crop and this fact should be taken into consideration in arriving at the value of the 1919 crop on the land. Under normal

conditions when the price of sugar on the first of the year might not be the price at which it would sell throughout the year it would be proper to consider the average price which could be expected over a period of years in estimating the value of the crop for that year, but where, as was the case on January 1, 1919, the government had fixed the price for that crop the fixed price should be used in estimating the value of that crop as a separate item of property. The method of considering the amount and value of the sugar which a crop will produce as a means of arriving at the value of the crop has been criticized, but we find that this method is of long standing, this court having approved it as far back as the case of *Gay & Robinson* v. *Assessor,* 17 Haw. 227, decided in 1905. In that case the only criticism of the result obtained by the assessor by this method was that he used the price of sugar at a time when it was particularly high instead of such as could reasonably be expected during a considerable period and had not made sufficient deductions for cutting and milling.

This court has also held that the full cash value of a piece of property is what it would sell for when sold in the manner such property is usually sold. Large acreages of cane are not usually sold at all as such but the plantation does dispose of its crops by manufacturing them into sugar and selling the sugar. Under all the circumstances we think that the method of considering the estimated yield of a crop in connection with the price of sugar, where all proper allowances for additional cost are deducted, furnishes the most satisfactory test of the value of a growing crop of cane.

The assessor has also been criticized for the method used by him in estimating the value of other taxable assets such as roads, bridges, fences, buildings, machinery, railroads and their equipment. The Onomea and

Paauhau companies each failed to place a valuation upon the different items of property combined and forming the basis of the enterprise for profit returned by it for taxes and Hutchinson plantation has only done so in part. The assessor has testified that he tried to get information from the managers of these plantations as to the value of the assets, but that in compliance with instructions received by the managers from the Honolulu office the information was refused. He says that having failed to receive any assistance from the plantation manager he resorted to the annual corporation exhibit filed with the treasurer and took the statement of value found therein for everything except the real estate and growing crops. These he estimated from his own knowledge of values and from information gathered from talking with men familiar with such matters. As to Honokaa, which did place a value upon the separate items of its taxable assets in its tax return, he took its valuation on all except the land and crops and these he estimated in the same manner as in the other cases. The statute does not require the return of property combined as an enterprise for profit to state the value of the various items separately, the aggregate value thereof being all that the statute requires (Sec. 1254 R. L. 1915), but the general and better practice is for the return to include the taxpayer's estimate of the value of each item of the combined property. Of course the assessor would not be justified in using an erroneous valuation because of the fact that the taxpayer had failed to place its estimate upon the separate items of property neither would he be bound by the values given by the taxpayer if found to be erroneous when tested by the rules laid down for his guidance which vary with different classes of property. For instance, this court held in *Alexander* v. *Fornander*, 6 Haw. 322, 325, that the cash value of an irrigation ditch for

tax purposes is what it is worth as a utility rather than what it cost because nothing of considerable value can be moved from its site.    In this connection we will notice the testimony of Mr. Richard A. Cooke, vice-president of Brewer & Company, who are agents for some of the plantations involved, and the principal witness for the taxpayers.    He gave the book value of each item of taxable property which represents the cost at the time acquired without allowing anything for depreciation.    He next gave the amount of depreciation which the company had written off of each item of property, the percentage of depreciation written off of each item annually being governed by the perishable or non-perishable character of the particular item as found by the experience of business men generally.    The depreciation is then deducted from the book value leaving a net value from which he has in most cases made heavy deductions because, as he says, the plantation if closing out could not remove the property and realize much if anything from a sale of the materials.    To illustrate, in one of the cases his testimony is that the railroad and rolling stock, which cost $208,068.93 and has a net value after depreciations have been deducted of $110,027.93, is only worth $30,000 because the roadbed which represents $65,000 of the value could not be sold if the plantation should close down. Practically the same contention is made as to the value of roads and fences, that is, that roads and fences which cost $37,934.66 and carried on the books as of the net value of $29,099.90 are only worth $100 because if scrapped there would be salvaged material probably worth this amount.    The contention of Mr. Cooke in this respect simply means that the property of the plantation, when considering it as separate items, should be taken at its scrap value, although he objected to that term and called his valuations closing out values.    By what-

ever term his method of arriving at values may be called it does not give the cash value of the property contemplated by the statute. To follow his theory to its logical conclusion, the Young Hotel building would be worth for taxation purposes only the value of the materials that could be salvaged if the building were demolished. Neither is the method used by the assessor in arriving at the value of the tangible assets by using the full book value contained in the annual corporation exhibits to be approved and would undoubtedly show too great a valuation unless proper deductions were made for depreciation because of use. Mr. Cooke has said that in writing off depreciations they endeavor to write off a sufficient percentage each year to take up the original cost by the time the thing is worn out and must be discarded and that if the thing is worn out and discarded before the depreciations written off equal the cost the percentage adopted has been too small. This statement cannot be refuted and the assessor should therefore be careful to ascertain the physical condition of each piece of property in order that proper allowance be made for the decrease in value. Of course where the physical condition of a plantation property is being properly maintained the replacements would to a large extent offset depreciations. All of these things should be considered in arriving at the valuation to be placed upon such property.

We will now take up the evidence in each case and undertake to arrive at a correct estimate of the value of the several properties.

#### ONOMEA SUGAR COMPANY.

As we have heretofore stated this company returned its property at $3,400,000, the assessor valued it at $4,250,000 and the tax appeal court fixed its value at $4,045,117. In arriving at this valuation the assessor says he first con-

sidered the sale of shares but found that so few had changed hands that such sales were entitled to very little weight in determining the value of the plantation. The evidence shows that Onomea is capitalized at $1,500,000, the stock being divided into 75,000 shares of the par value of $20. Of this stock 1284 shares were sold in 1918 on the Honolulu exchange and 2605 on the San Francisco exchange at prices ranging from $44 to $50 per share. If the prices at which shares of this stock sold in 1918 were taken as the sole criterion the value after deducting the non-taxable assets would be far below the value returned by the company. This court has said that "the main consideration is the future; the past being of importance chiefly in determining what the future is likely to be," (*Tax Assessment Appeals,* 11 Haw. 237) and that "the effect of all the factors is shown largely by the actual sales of stock, for this shows what persons who actually invest consider the property to be worth" (11 Haw. 244). However, this court has also said that "It would be entirely unsafe to test values of corporation property solely by sales of shares of its stock or by prices offered without regard to the number of shares sold or bid for or whether they are bought for investment or speculative purposes. No hard and fast rule of testing values can be made to apply in all cases and yet practical common sense and a desire to assess at their fair value furnish an excellent guide." *Tax Assessor* v. *Wailuku Sugar Co.,* 18 Haw. 423. The number of shares of Onomea sold in 1918 constitutes a small fraction of the total number of shares issued by that company and we know nothing of the character of the purchasers or whether the purchases were made for investment or speculative purposes. Under these circumstances we think that both the assessor and the taxpayer were justified in not giving to these sales of shares a controlling con-

sideration.  The assessor next took up the question of
net profits made by Onomea over a period of four years
and over a period of eight years, taking the information
as to profits from the corporation exhibit of the company
for the year ending December 31, 1918.  For the four
year period he found that the net average profits
amounted to $676,494 annually.  Taking the eight year
period he found that the net profits amounted to $505,998
annually.  There is some discrepancy between these fig-
ures and those given by a witness for the taxpayer, as
$485,414 for the average annual net profit for the eight
year period.  According to Mr. Shipman's figures the
profits for eight years amounted to $4,047,984.  The tax
appeal court in fixing the value at $4,045,117 arrived at
a figure a little less than eight times the average annual
profits for the eight year period as given by Mr. Shipman,
or considered as a percentage at a rate a little better
than 12½%.  We are not advised which figures the tax
appeal court accepted or how it arrived at its valuation
but it may be inferred that it considered the capitaliza-
tion of the past profits in connection with all other facts
as furnishing a reliable guide to its value.  The evidence
of both the assessor and the taxpayer as to the value of
the tangible assets outside of the land and growing crops
furnishes very little information for the reasons pointed
out in our general discussion.  The evidence does show
that this plantation is in good condition and has main-
tained a fairly uniform production of sugar.  It owns
25,822 acres of land of which 5733 acres are classed as
cane land and the remainder as forest and pasture land.
It leases 1742 acres of which 1420 acres are cane land
and the remainder forest.  The evidence clearly justifies
the valuation of $200 per acre for the cane land and $10
per acre for the forest and pasture land placed upon it

by the assessor. The plantation is not irrigated but has an abundance of rain.

A decision of the tax appeal court, though not having the conclusiveness of a jury verdict, should not be disturbed for light reasons. *O. R. & L. Co.* v. *Assessor,* 17 Haw. 163; *In re Taxes Bishop Estate,* 13 Haw. 671; *In re Tax Assessment Appeals,* 11 Haw. 235, 236. The burden is on the appellant to show that the decision of the tax appeal court is erroneous. *Assessor* v. *Wilder,* 17 Haw. 425; *Lihue Plantation Co.* v. *Farley,* 13 Haw. 283. Neither appellant in this case has shown to our satisfaction that the decision of the tax appeal court is erroneous.

The decision is therefore sustained.

### HUTCHINSON SUGAR PLANTATION COMPANY.

The assessment of this plantation for 1917 was $1,575,-000; for 1918 it was $1,750,000. The company returned it for 1919 at $1,460,000 and the assessor raised it to the same as the 1918 assessment and the tax appeal court fixed it at the same as the 1917 assessment. Both the assessor and the company have appealed.

There were no sales of stock in 1918 so neither the assessor nor the company has given any consideration to the value of its shares. The assessor and taxpayer practically agree on the net profits of this company for both the four and eight year periods, the assessor having accepted the profits given in the corporation exhibit for the four years preceding the assessment at $290,409 and the eight year period at $210,541, while the evidence of Mr. Cooke places these profits at $290,110 and $203,936 respectively. If we capitalize these profits for the eight year period as given by Mr. Cooke at 12½% we would arrive at a value of $1,631,488, and if we accept the profits for the eight year period as given in the corpora-

tion return at the same rate of capitalization we would get a value of $1,684,328.

The manager of the plantation in making the tax return has placed the value of the assets of the company at $2,113,331.48 which includes $195,889.21 of non-taxable property and property upon which a specific tax is paid. This return also shows a depreciation reserve of $314,-388.53. If we deduct the non-taxable assets and the depreciation reserve we get a valuation of $1,603,053. But the assessor did not accept the valuation of the manager on land and crops. He found a less value for the land and a greater value for the crops, the manager's valuation of the lands being $554,894 and the assessor's valuation $530,855. The manager's valuation of the crops was $277,056, while the assessor considered them worth $534,810. The manager's overvaluation of the land is probably due to a mistake on his part as to the acreage owned by the company and would indicate that Mr. Shipman's valuation is more nearly correct. Mr. Cooke has given his opinion that the real estate is worth only $197,407, but in the face of the return and Mr. Shipman's evidence his estimate can hardly be accepted. Mr. Cooke also disagreed with both Mr. Shipman and the manager of the plantation as to the value of the growing crops, his estimate being $102,350, although contending that considered as a separate item it has no value. But Mr. Cooke tells us that the total cost of additional cultivation, harvesting and marketing in 1918, including everything which he thinks constitutes a proper charge on these accounts, cost about $97 per ton of sugar on this plantation and as sugar was worth $145 the difference would be approximately $48 per ton or a total on the estimated yield of $334,740. He then discounts this at 4%, leaving $321,350. He then insists on a further discount of 15% on the value of the whole plantation as a

fair profit which would reduce the value of the 1919 crop to $120,350. But Mr. Cooke further tells us that prior to January 1 there had been expended on the 1919 crop the sum of $72,780 or $10.40 per ton of sugar expected from the crop. It is clear from his estimate of cost that he expects the plantation to make a profit of $248,570 after having been allowed a discount of 4% on the cost. If we add the amount expended to the expected profit we get $321,350 from which we will deduct 10% for contingencies, leaving $289,215 as the value of the 1919 crop according to Mr. Cooke's figures. Mr. Cooke is in better position to know the actual cost on this plantation than the assessor and we think the figures given by him rather than his estimate or the figures given by the assessor furnish the best estimate of the value of this crop. The evidence as to the 1920 crop is not nearly so enlightening, but estimating it in the same way we think $100,000 would be fair to both parties. If we deduct from the manager's valuation of real estate $24,039 to make it conform to Mr. Shipman's estimate and add to the manager's estimate of the value of the crops $111,461 to make it conform to our estimate we would have $87,422 to add to his valuation of the assets which would bring the value of the assets up to $1,690,475. But Hutchinson is a non-irrigated plantation situated in Kau where the rainfall is not plentiful, though considering these facts the production of sugar has been remarkably uniform, there having been only one year within the past eight years when there was a marked variation in the tonnage of sugar per acre, the yield being by years as follows: 1911, 3.85 tons; 1912, 3.43 tons; 1913, 3.05 tons; 1914, 3.26 tons; 1915, 5.28 tons; 1916, 3.92 tons; 1917, 3.83 tons and 1918, 3.45 tons, or an average for the eight years of 3.76 tons and for the past four years of 4.12 tons. The plantation also leases a considerable proportion of its land. Of

3849 acres of cane land cultivated it owns 2594 and leases the balance, while of its lands of all classes it owns 17,423 out of 45,310 owned and leased together.

All things considered we think that this plantation as a whole should be valued at $1,650,000.

### PAAUHAU SUGAR PLANTATION COMPANY.

Only 180 shares of stock out of a total of 100,000 shares issued by this company sold in 1918 and we are not informed at what price these sold. Neither side relied on the price of shares as indicating the value but confined its investigation to tangible assets in connection with profits and other things affecting the value of the plantation as a whole.

In this as in the Onomea case the assessor for the same reason resorted to the corporation exhibit for the value of the tangible assets except land and crops which he estimated in the same manner that he estimated Onomea. What we have said in regard to this in the Onomea case applies here as well.

Mr. Cooke, for the taxpayer, has tabulated the taxable tangible assets giving the original cost, the depreciation, the net value after deducting depreciation and his estimate of sale value. It is evident, however, from his evidence that his estimated sale value is based on an entirely erroneous theory as to what value is to be considered. We have already discussed this line of evidence in our general discussion of these cases. It seems to us that the net value after making proper deductions from the cost of each item for depreciation would give the full cash value unless the value has been increased or decreased by reason of their combination. The taxable assets according to Mr. Cooke's tabulation have an aggregate net value of $1,224,778 if we accept his valuation of the lands and crops. He places the value of the land at $140,907,

the 1919 crop at $150,960 and the 1920 crop at $77,033. Mr. Shipman thinks the lands are worth only $104,993, the two crops worth $521,700, while the corporation exhibit places the value of the growing crops at $523,708 and the real estate at the same value contained in Mr. Cooke's schedule. If we accept all of Mr. Cooke's figures except the land and crops and take Mr. Shipman's figures for these two items we have a value of $1,482,571.

Considered on the basis of capitalization of profits, however, the value fixed by the assessor and the tax appeal court will give this plantation a less favorable rate than Onomea while it is evident that the plantation is less favorably situated and not as good or consistent a producer as Onomea nor as consistent as Hutchinson though the tonnage per acre for the eight year period is about the same as Hutchinson. The large showing of taxable assets is the only thing that could justify the valuation sustained by the tax appeal court. This valuation is over $230,000 less than would be justified if the plantation had made a favorable showing in profits. The profits for several years prior to 1918 were very large. 1918 showed a loss of $137,928 due to a very severe drought and a smaller acreage than usual. But the estimated crop for 1919 is much nearer the normal size. Under these conditions too much weight should not be given to the temporary falling off of profits. We think that the reduction of $230,000 from the net value of the taxable assets is as liberal as the facts warrant and therefore sustain the valuation of $1,250,000.

### HONOKAA SUGAR COMPANY, LIMITED.

Only 200 shares of the stock of this company out of a total of 100,000 shares issued sold in 1918 at prices ranging from $4.75 to $6.25 per share. The company had a bonded debt of $600,000, less a sinking fund of $36,029.31,

leaving a net bonded debt of $563,970.69 and a large floating debt, one item alone being $195,784 due its agents. "In ascertaining the aggregate value of all the property owned by a corporation the amount of the debts, if any, of the corporation should be added to the selling price of the shares of its capital stock." *Assessor* v. *Brewer & Co.,* 15 Haw. 29. If any considerable number of shares of this company had sold in 1918, even at the lowest figure quoted, it would indicate that the purchasers thought its total assets, taxable and non-taxable, have a value of well over $1,000,000. The non-taxable assets are valued by the witness for the taxpayer at a little over $300,000, and the stock sales would therefore indicate, if anything at all, that the assessor and the·tax appeal court had not overvalued the property in fixing its value at $700,000.

The detailed return of the taxpayer shows a valuation of its taxable assets at $522,594.50. We will notice a few discrepancies between the valuation of items in the detailed return and the valuation placed on the same items in the statement of assets also contained in the return and which we assume is copied from the annual exhibit. In the detailed return the cane crops are valued at $78,-062 while in the statement of assets they are valued at $473,814.28. In the detailed return merchandise is valued at $60,000 while in the statement of assets the same item is valued at $138,071.18. In the detailed return flumes, ditches and pipe-lines are valued at $6000 and in the statement of assets at $30,000. These few comparisons indicate either extreme conservatism of this company in appraising its property for taxation purposes or extreme recklessness in appraising it for the purpose of its annual exhibit. It is quite evident that Honokaa has a large amount of property involved in an enterprise which, judged by past performances, is almost entirely unprofit-

able due to a combination of circumstances such as drought, disease in the cane and an expensive plantation to run. This fact should be given due consideration in fixing the value of the property as an enterprise for profit although it should not be allowed to overshadow all other considerations. In the past ten years five years have shown a profit and five a loss almost equal to the profits. Of the four years last past all except 1918 showed good profits. 1918 showed a rather heavy loss. The outlook for 1919 was much more favorable than 1918 had proved to be due, we would judge, primarily to the fact that a much heavier yield of sugar was expected, but judged by the past this plantation can expect drought periodically and it has not sufficient water to properly irrigate in periods of drought.

We find that this plantation within the past ten years has been assessed all the way from $1,200,000 (1910) to $450,000 (1918). The assessment was never below $1,000,-000 until 1914 when it was reduced to $600,000. It was raised to $675,000 in 1916, to $700,000 in 1917, lowered to $450,00 in 1918 and again raised to $700,000 in 1919.

Had this plantation been able to repeat in 1918 the same showing made in the three preceding years we would have no hesitation in sustaining the assessment at $700,000, but in view of the extremely poor showing made as a profit earner we think that a return to the valuation of 1914 at $600,000 will do substantial justice to both parties. Of course if the outlook improves to such an extent that the profits of 1915 to 1917 may be expected the relatively large holdings of this company would justify a substantial raise.

*J. Lightfoot,* First Deputy Attorney General, for the assessor.

*Robertson & Olson* for the taxpayers.