RE TAXES OAHU SUGAR COMPANY, LIMITED.

No. 1525.

APPEAL FROM TAX APPEAL COURT FIRST TAXATION DIVISION.

SUBMITTED NOVEMBER 28, 1924.          DECIDED JANUARY 20, 1925.

PETERS, C. J., PERRY AND LINDSAY, JJ.

TAXATION—*cash value of growing crops.*

In estimating the present cash value of growing crops of cane at the taxation period it is proper to consider as a part of the expense of thereafter bringing them to maturity and harvesting and delivering the same at the main lines of railroad of the miller every factor reasonably contributing to the production, harvesting and delivery of such crops.

OPINION OF THE COURT BY PETERS, C. J.

The taxpayer conducts a sugar plantation on the Island of Oahu consisting of a large area of land mostly under lease which it cultivates in cane, and a sugar mill where it grinds and manufactures its cane into sugar. All its operations are under its personal management and control. It is an enterprise for profit as that term is employed and understood in the tax law. On January 1, 1923, it returned such of its property as was subject to taxation upon that date at the sum of $6,729,090.04. The assessor assessed the company at $8,000,000. The taxpayer appealed to the tax appeal court where the assessment of the assessor was sustained. The taxpayer appealed from the judgment of the tax appeal court from all of the assessment in excess of $7,100,000. The parties stipulated as to the number of shares of the capital stock of the taxpayer and its par value, the market value of its shares of stock, the aggregate value of all items of taxable property except crops of growing cane, the aggregate

value of the items of nontaxable property and its debts (all as of January 1, 1923), the net profits enjoyed by the taxpayer for the preceding seven years, the estimated crops of cane for the year 1923 and the year 1924, and the fair estimated average price of sugar for those years.

The only issues therefore before this court are the cash value of the 1923 and 1924 standing crops of growing cane owned by the taxpayer as of January 1, 1923, and, when ascertained and added to the admitted separate values of all the other items of taxable property, whether the aggregate value thereof exceeds $7,100,000.

To arrive at the value at the taxation period of the 1923 and 1924 crops of growing cane owned by the taxpayer alternate methods of computation were employed, each depending upon the agreed estimated tonnage of cane of each crop and the average price of sugar for the years 1923 and 1924. By one method was computed the salable value of cane delivered by an independent planter to the main railroad lines of the taxpayer as a miller at the taxation period. It was arrived at in this way. Other sugar plantations similarly situated as the taxpayer were used as criteria. It appeared from the evidence that these other plantations had planting contracts with independent planters under which for each ton of cane delivered to the main lines of railroad of the former it paid the latter $1.20 per ton for each cent of the average of the daily open market quotations per pound in New York for sugar polarizing 96 per cent. for the month during which cane deliveries were made by the planter to the miller. Allowing for the ratio of quality between the cane of these plantations and that of the taxpayer an estimate was made of the price that the taxpayer would be reasonably required to pay to independent planters for cane similar to the average quality of that of the taxpayer. A unit price a trifle in excess of $8.60 per ton was thus

secured. Both parties in their computation adopted $8.60 as the unit of value per ton of cane when harvested and delivered to the miller at its main lines of railroad. This value for want of a better term and considering the purposes for which it is employed may be considered as its "gross" value. The value of the 1923 crop estimated at 303,230 tons was computed to have a gross cash value when harvested and delivered of $2,607,778.20. To obtain the present value as of the taxation period there was deducted from the gross value as thus obtained the estimated cost of bringing the respective crops to maturity and harvesting and delivering the same to the main lines of railroad of the taxpayer. For such costs applicable to the 1923 crop the taxpayer claimed aggregate deductions of $881,005.87; for the 1924 crop, $2,376,840.81. By this method the cash value of the 1923 crop as of the taxation period was estimated at $1,726,772.33; the cash value of the 1924 crop at $311,226.79; the cash value of both crops at $2,037,999.12, which when added to the agreed value of the other taxable property made a grand total of $7,102,200.16 as the aggregate cash value of the several items of property of the taxpayer separately assessed. The tax assessor estimated the aggregate cost of bringing the 1923 crop to maturity and harvesting and delivering the same at the main lines of railroad of the miller at $345,609 and those of the 1924 crop at $1,343,370. The cash value of the 1923 crop as of the taxation period was estimated by the tax assessor at $2,262,169; of the 1924 crop at $1,344,697.60. The cash value of both crops at the taxation period as estimated by the tax assessor was $3,606,866.60, which, added to the assessed value of the other taxable property, made a grand total of $8,671,067.64 as the aggregate cash value of the several items of the taxpayer separately assessed.

The alternate method is an outgrowth of the first. After ascertaining the number of tons of cane of the taxpayer reasonably required to manufacture one ton of sugar, with the agreed average price of sugar as a basis, the estimated crop was valued in terms of sugar and from its gross value as sugar thus secured was deducted in addition to the cost of cultivating, harvesting and delivery, the cost of transportation to the mill, milling, manufacturing and marketing. This latter method was alone employed by the tax assessor. By this method he estimated the present cash value of the 1923 crop as of the taxation period at $2,229,968; of the 1924 crop at $1,269,964.80, or $3,499,932.80 for both crops. Having thus obtained the cash value of the two crops as of the taxation period the assessor after making adjustments to reconcile the figures found in the balance sheet of the taxpayer as of December 31, 1922, with the figures agreed upon between the parties computed the aggregate cash value at the taxation period of the taxable property of the taxpayer to be $8,606,799.31. By comparison it would appear that one arrives at about the same result by either method of computation when the figures of the tax assessor are employed. No other method of estimating the value of the crops of the taxpayer was suggested by either party.

For the purpose of determining the value of the 1923 crop either method is perhaps as satisfactory as any that might be devised. Both have been uniformly employed and have received the sanction of this court for a series of years. Upon the taxation date this crop was practically mature, the several fields differing in maturity only as they may have differed in order of planting. Much of the cultivation from then on was more or less a matter of preserving the cane until limited mill capacity permitted it to be cut and ground. It had a

present salable value.   Not so, however, with the 1924 crop.   It was a very young crop, having been but planted in the fall of the previous year.   It would not be harvested until the end of 1924 and early in the spring of 1925.   It was liable to a great variety of contingencies usually prevailing in agricultural enterprises.   It is doubtful whether at the taxation period it had any present market value.   The price of sugar that might obtain at the time it was harvested would be ordinarily problematic.   Fortunately the stipulation of the parties in this case eliminates this element of uncertainty.   Its cash value upon the taxation date to say the least would be, under ordinary circumstances, highly speculative.   Absence from the record, however, of elements that might permit the employment of other methods of computation of the fair cash value of the 1924 crop at the taxation period compels us to adopt the methods employed.

The parties having stipulated as to the aggregate value of all items of taxable property of the taxpayer with the exception of growing crops, the estimated tonnage of each crop having been agreed upon and the fair estimated average price of sugar for the years 1923 and 1924 being agreed the gross value of the respective crops either as cane delivered at the main lines of railroad of the miller or as sugar salable in the open market is undisputed.   The only question of difference between the taxpayer and the tax assessor is as to what expenses should be considered in computing the present value of the respective crops at the taxation period.   In estimating the costs of bringing the respective crops to maturity, and harvesting and delivering the same to the main railroad lines of the taxpayer, the tax assessor employed the items of costs disclosed by the report of the taxpayer for the year ending December 31, 1922, with an additional arbitrary allowance for sundries and

legal interest on capital employed. In estimating the value of the respective crops as sugar he allowed as an additional deduction fifteen per cent. on the authorized capital of the company. The taxpayer employed practically the same figures except that it included in such costs not only the estimated cost of the actual planting, cultivating, irrigating, harvesting and delivery of the respective crops but also repairs to and depreciation of equipment to be employed, rental of lands used and taxes to be paid and the proportionate share that the agricultural department should bear in the estimated costs of all equipment that would be used in common by the milling as well as the agricultural department, such as insurance, legal and medical assistance, office stationery, welfare work and the like. The assessor does not dispute the figures of the taxpayer nor does he claim that these items of repair, depreciation, taxes, etc., are not properly chargeable. His principal objection is that these items are not included by the taxpayer in the costs charged against these crops in the year 1922 as disclosed by the taxpayer's annual report and that by his allowance under the heading of "Sundries" all the items claimed by the taxpayer are fully covered. In the absence of any showing that the estimates of the taxpayer are incorrect they must be taken at their face value. That the annual report of the taxpayer referred to does not contain these items as direct charges against the respective crops is immaterial. They are covered elsewhere in the report and properly entered as debits against the annual gross profits of the company. That the tax assessor allows an arbitrary amount to cover sundries does not meet the situation. If the items of deductions contended for by the taxpayer are properly deductible in computing the present value of the crops as of the taxation period and the amounts thereof are

correct—and we must assume that they are correct in the absence of evidence to the contrary—these amounts and not the arbitrary allowance of the tax assessor must control.

That these items are properly deducted cannot admit of doubt. This court has uniformly held that in computing the present value of growing crops as of the taxation period it is legitimate for the taxpayer to take into consideration the costs and expenses of bringing them to maturity and realizing upon them. In the case of *Tax Assessment Appeals,* 11 Haw. 235, 239, this court held, "No doubt a planter may include in running expenses whatever is necessary to maintain the plantation efficiently;" in the case of *Tax Assessment Ewa Plantation Co.,* 16 Haw. 555, 556, the court took into consideration "improvements * * * to keep up its earning capacity," " * * * additional cost of marketing," "to replace and fix machinery that has been disabled" it "would take about $100,000 a year;" in the case of *Gay & Robinson* v. *Assessor,* 17 Haw. 227, 230, "deductions for the cost of cutting and milling;" *In re Taxes Waiakea Mill Co.,* 24 Haw. 333, 336, "the cost of · harvesting, milling, insurance, freight, weighing, commissions and incidental expenses;" *In re Taxes Waiakea Mill Co.,* 25 Haw. 628, 631, "cost * * * to harvest, mill and market;" *In re Taxes Onomea Sugar Co.,* 25 Haw. 278, 284, "the cost of converting a standing crop," "the cost of finishing any immature crops." In the case of *Re Taxes Haw. Com. & Sug. Co.,* 26 Haw. 708, 710, the court considered as an item of cost "fixed charges" pertaining to the plantation. These considerations are reasonable and proper and we see no good reason for departing from the views heretofore expressed. The consideration of depreciation, repairs, rent, taxes and the like is but a further step in the same direction. All these items of cost are just

as material to and a part of the cost of cultivating and harvesting growing crops as labor, irrigation, cutting, loading and transportation. We see no difference in principle and in reason there can be none. In estimating the present cash value of growing crops of cane at the taxation period it is proper to consider as a part of the expense of thereafter bringing them to maturity and harvesting and delivering the same at the main lines of railroad of the miller every factor reasonably contributing to the production, harvesting and delivery of such crops.

The taxpayer, however, in its computation of the value of the crops as cane delivered to its main lines of railroad included as a deduction items termed "discount" of fifteen per cent. of the capital employed in its production, harvesting and delivery. These items apparently represent profit. The record is silent, however, as to what profit a planter might reasonably expect upon capital employed in the planting, cultivating, harvesting and delivery of cane at the miller's main lines of railroad. In the absence of such evidence and due to the fact that the exclusion of this item does not ultimately affect the amount of the assessment acquiesced in by the taxpayer, neither the propriety of such deduction nor the amount thereof if proper is passed upon.

In any event the discount claimed on the 1924 crop is perhaps offset by the contingencies to which that crop is subject. The 1924 crop may not justify expectation. Although the estimated tonnage is agreed a prospective purchaser would expect that these contingencies be taken into consideration. Unfortunately here, similarly as in the case of discounts, the record is silent as to what allowance a prospective purchaser at the taxation period might expect. It is the salable value of the subject of assessment at the taxation period that controls.

But though evidence permitting definite computation may be absent these conditions must nevertheless be considered.

Moreover we believe in view of all the evidence that the assessment of $7,100,000 is reasonable and fair both to the Territory and to the taxpayer. Upon the taxation date the shares of stock in the company were selling at $34.50 per share. It is a stock largely dealt in upon the local exchange. The capital stock of the company is divided into 300,000 shares. Without allowing for reduction in price for purchases of large blocks of stock, after adding to the aggregate sale value of its stock its debts and deducting therefrom the value of its nontaxable property, we have a cash valuation of $5,094,318.59. This is a consideration which reasonably and fairly bears upon the question of valuation of the taxable property of the taxpayer.

Whether by capitalization of the taxpayer's average annual profits for the seven years next preceding the taxation date the value of the taxable property of the company would be in excess of $7,100,000 we are not advised. No evidence was adduced as to whether the average annual profits of the company during that period is a fair criterion of what profits the taxpayer might reasonably expect in the immediate future nor what rate of capitalization would be reasonable in the premises, and in the absence of such evidence this method of computation cannot be employed.

Upon all the evidence the judgment of the tax appeal court is reversed and the assessment of the taxpayer as of January 1, 1923, is fixed at $7,100,000. A decree consistent herewith will be signed upon presentation.

H. Holmes and I. M. Stainback for the taxpayer.

H. R. Hewitt, First Deputy Attorney General, for the assessor.