Syllabus.

## IN RE TAXES B. P. BISHOP ESTATE.

## No. 1450.

APPEAL FROM TAX APPEAL COURT FOURTH CIRCUIT.

ARGUED FEBRUARY 20, 1923.                    DECIDED MAY 22, 1923.

PETERS, C. J., PERRY AND LINDSAY, JJ.

TAXATION—*construction of return.*

When a return of property for the purposes of taxation is capable of the construction that it relates to a tract of land as a whole and not to the subdivisions or lots of which it is constituted and the assessor so treats it and thereafter in the appeal to the tax appeal court, in the appeal to this court, in the proceedings before the tax court and in the proceedings before this court all of the parties in interest construe and treat the return in the same way, this court will not of its own accord construe the return as being a return of the individual lots separately.

SAME—*definition of "cash value."*

The term "cash value," as used in the tax statute, means the highest price which the property will bring for cash on the assessment date whether sold as a whole or in lots,—whichever will bring the higher return—and after reasonable advertisement. It means the cash price obtainable if *all* the property were sold on the assessment date and does not mean what the property would bring if some of its subdivisions were sold on the assessment date and others from time to time through a period of six months or one year after the assessment date.

SAME—*valuation of property—income-producing capacity.*

The income-producing capacity of property is an important consideration in determining its taxable value.

SAME—*valuation—evidence.*

Upon the evidence in this case the taxpayer's return is sustained.

OPINION OF THE COURT BY PERRY, J.

This is an appeal from a decision of the tax appeal court sustaining the assessment placed by the assessor upon land of the taxpayer-appellant. The property assessed contains an area of 519,844 square feet but is leased in subdivisions or lots to various tenants. The

return was made by the taxpayer upon that portion of an ordinary tax return blank which is entitled "Lessor's Return of Real Property Leased" and in the return as made the various lots are enumerated, the two royal patents or grants of which they all form a part are set forth, the area is given together with the date of the lease covering each lot, the number of years for which the demise was made in each instance, the annual rents reserved, the names of the lessees and a separate valuation for each lot. The total valuation placed upon the whole tract is also given, to wit, in the amount of $125,685. In the notice given by the assessor to the taxpayer in April of the taxation year, as required by law, showing the assessment as made, the matter is similarly treated by the assessor, that is to say, by setting forth information in some but not in as much detail concerning each lot. The total valuation returned is given in that notice together with the total of the assessment of $258,266. If there were nothing more to this feature of the case it may be that the return would be susceptible of the construction that it was a return of each lot separately and not of the tract as a whole. But that is not all that appears from the record. In appealing from the assessment the ordinary printed blank customarily prepared and furnished by the assessor was used. The statement therein made is that the "real property" was returned at $125,693 and assessed at $238,266. In this notice of appeal no reference was made to any subdivided lots or to any particular portions of the tract. The notice was evidently accepted by the assessor as a correct statement of the facts of the return and the assessment. In the briefs filed before the tax appeal court, and doubtless in the oral argument as well, the questions at issue were argued by both sides as though the return and the assessment were both of the one tract as a whole and no discussion was there had of

the values of any individual lots.  The tax appeal court also treated the matter in the same way, giving in its written decision no consideration whatever to the value of any separate lot or lots and placing a valuation of $258,266 on the property as a whole and declaring that it was thereby sustaining the assessment as made.  The appeal to this court by the taxpayer was similarly from the decision sustaining the assessment and recited that the land in question was returned by the taxpayer at the valuation of $125,685.  Again no objection was made by the assessor or his representative.  So also in this court the treatment of the case throughout by counsel on both sides has been upon the theory that it was the tract as a whole that was returned and assessed and no effort has been made either in the oral or the written argument by counsel on either side to ascertain the value of any particular lot or lots.

Both the return and the assessment are easily susceptible of the construction that they related to the tract of land as a whole and under the circumstances above recited they should be so construed.  It is unnecessary either from the point of view of the form of the return and the assessment or in the consideration of the value of the tract as a whole to make any study of or reference to the value of any one or more or all of the separate lots.

The principles involved in the taxation of property have been definitely and firmly established in this jurisdiction.  The property must be assessed at its "cash value" as of the assessment date, which in this instance was January 1, 1922.  The term "cash value," as used in the statute, means the highest price which the property will bring for cash whether sold as a whole or in lots,— whichever will bring the higher return—and after reasonable and fair advertisement.  It means the cash price as aforesaid obtainable if *all* the property were sold on

the assessment date,—it does not mean what the property would bring if some of its subdivisions were sold on the assessment date and others from time to time through a period of six months or one year after the assessment date. See R. L. 1915, Sec. 1241, as amended by S. L. 1921, Act 250; *In re James B. Castle,* 15 Haw. 1, 2; *Kash Co.* v. *Assessor,* 15 Haw. 476, 478.

What is the evidence in the case at bar? On behalf of the assessor the following witnesses testified: Messrs. Aona, Beers, Tinker, Vicars and Stone, and for the tax-payer Messrs. Collins and Gurney. The testimony of Messrs. Aona and Beers was to the effect that the County of Hawaii in amicable settlement of judicial proceedings brought by the county for condemnation of certain land in Hilo desired for road-widening purposes had paid for that property from $2 to $2.50 per square foot. The only inference deducible from the record is that the circumstances surrounding this property and the purchase thereof were not such as to entitle this evidence to any force in connection with the ascertainment of the value of the taxpayer's property involved in this appeal. No party to the present controversy seems to attach any great weight to this testimony. It is entitled to none. Mr. Tinker testified that he did not know the area of the frontage of the property in question, gave no information as to the total value of the property, said that he thought it worth 50c per square foot "for the whole thing as an average" but added that the "back lots" would sell only "if sold on easy terms." This last statement of his shows that in forming his estimate of 50c per square foot he had not the correct legal principles in mind. The law contemplated not "easy terms" but a sale for all cash. Mr. Vicars, without knowledge of the frontage of the tract, thought that its front portion, 100 feet in depth, would be worth "around 60c a square foot." "Quite a number

of lots would sell at 60c" he said, adding that "I do not think there would be people interested in that land" (meaning all the front lots) "who have got the money to buy it with." This witness therefore likewise failed to apply correct legal principles. What is desired is not what a portion or portions of the tract would bring but what the whole of it could sell for on that date. Mr. Stone, the deputy tax assessor who made the assessment, testified expressly that he did not consider the income-producing capacity of the property, that he valued the whole of the property at 50c per square foot, and that in his opinion the value was "conservative." In explanation, however, of his opinion, he said: "Of course, maybe you could not sell it at any one time; it would take a reasonable length of time and things are dull in every line of business as well as in real estate and some property maybe could not be sold but it still has the value. It might take a year to sell the frontage at that price. No such frontage of 2000 feet could be readily disposed of, not at the present time, it would take quite a while to dispose of any such amount of property as that." This witness, too, showed a lack of appreciation of the correct principles involved and his evidence therefore is not of value.

The case stands therefore as though no evidence had been adduced by the assessor which can be of assistance to this court in determining the "cash value" of the tract on the assessment date.

For the taxpayer Mr. Collins testified that for five years he had been superintendent of the land department of the Bishop Estate, gave in detail a description of the land involved, including its dimensions, and otherwise showed an entire familiarity with all the facts of the case. He gave it as his opinion that the amount returned "represents the fair cash value of this property." Mr. Gurney,

the other witness for the taxpayer, testified to a residence of twenty-four years in Hilo and to his familiarity with real estate values there. He said that he thought that the return as made was "a fair return" but expressed doubt "that this property, if put up as a whole, would bring as much as the amount of the return," adding that if the tract were sold by lots, "some lots might bring 50c per square foot but not all the lots could be sold at the present time." Such evidence as this, coming from experts familiar with real estate values, is always admissible in cases of this kind. There is no reason for doubting the credibility of these two witnesses or the soundness of their judgment.

In another way also the same result is reached. The evidence is undisputed that there are outstanding on this tract twenty-six "old leases," as they are called (meaning thereby leases made prior to 1919), covering about 199,000 square feet and expiring in various years from 1922 to 1936. The total rentals in force on the assessment date amounted to $5638 per annum or an income of a little less than 4½% on the amount returned by the taxpayer. The evidence is undisputed that investors purchasing property of this nature would require assurance of a return of 8% per annum on the capital invested. It also appears that if the "old leases" had all expired prior to the assessment date and leases at the same rate secured in the "new leases" were in effect for all of the property the rental would be a return of 6% on a capital value of $179,750 or of 8% on a value of $134,812. The fact remains, however, that the "old leases" were still existing at the assessment date and constituted an encumbrance rendering the total value of the property less than it would be if they had been wholly substituted by new leases. Without resorting to exact or intricate mathematical calculations, it is obvious that the difference be-

tween the amount of the return, $125,685 and the sum of $134,812 is clearly not too great an amount to allow for the depreciation caused by the existence of the outstanding "old leases."

It cannot be doubted at this date that the income-producing capacity of property is an important consideration in determining its taxable value. *In re Tax Assessment Appeals,* 11 Haw. 235, 237, and *In re Taxes Kapiolani Estate,* 21 Haw. 667, 671.

The improvements have all been taxed separately to the lessees and for that reason alone need not be further considered in this case. Moreover, the undisputed evidence is that the buildings are all wooden structures and of cheap construction. Ordinary experience teaches that they will be of very little, if any, value at the expiration of the leases. The tax court which purports to place some emphasis upon this matter of improvements has not in its decision stated what improvements it found on the property which did not fall within the description given in the testimony here recited. The assessor has presented no evidence tending to show that the improvements will be of any material, salable value at the expiration of the leases or tending to show the present worth of the lessor's interest in them at the assessment date. From all of the evidence the only finding that can be made is that they do not add to the value of the lessor's interest in the property.

In view, therefore, of the opinions of the experts who testified for the taxpayer and upon a consideration of the income-producing capacity of the property the judgment should be reversed and the taxpayer's return sustained.

*A. G. M. Robertson* (*Robertson & Castle* on the brief) for the taxpayer.

*H. R. Hewitt,* Deputy Attorney General (also on the brief), for the assessor.

CONCURRING OPINION OF PETERS, C. J.

This appeal involves blocks B, C, D and E of the Piopio tract in the city of Hilo, Hawaii County, having an aggregate taxable area of 519,844 square feet.   They abut in the order named upon the mauka or northerly side of Kamehameha avenue, formerly known as Front street, with an aggregate frontage, according to the blue print in evidence, of approximately 2110.89 feet and are separated by intervening spaces suitable for streets.   The rear of blocks B, C and D adjoins Punahoa street which runs parallel to Kamehameha avenue, terminating at the Wailoa river where it flows past the northeast corner of block D.   Punahoa street is unimproved but capable of traffic.   Block E is bounded on the rear in part by the north bank of the Wailoa river and in part by a detached piece of government land bordering upon the north side of the river.   Its easterly end forms a gore between the tracks of the Hilo Consolidated Railway Company and a small government piece on the north side of the river. The northwesterly corner of block B is about 110 feet easterly from the northeasterly corner of Kamehameha avenue and Piopio street.   The dimensions of these blocks, beginning with the Kamehameha avenue frontage and proceeding around as the hands of a clock, are: Block B: 242.3 ft. x 293 ft. x 242.3 ft. x 280 ft.; block C: 600.82 ft. x 258.4 ft. x 600.82 ft. x 289.9 ft.; block D: 597.77 ft. x 290 ft. x 597.77 ft. x 255 ft.; block E: on Kamehameha avenue 670 ft., then follows an irregular line from the northeasterly corner to the southwesterly corner and the westerly side is 250 feet long.   The tract narrows at the center and then widens until it intersects the Wailoa river and narrows again.   All of these blocks are subdivided into lots.   The subdivision of blocks B, C and D was effected by practically dividing the blocks in two by lines parallel to Kamehameha avenue and Punahoa street and running lines across the blocks approximately at

right angles to the bisecting line at intervals in block B
of 60 feet and in blocks C and D of 50 feet. Block E
was subdivided by running diverging lines from Kameha-
meha avenue at intervals of 50 feet through to the rear,
resulting in slightly wider lots in the back than upon the
Kamehameha avenue frontage. Due to the irregularity
of the rear boundary some lots are of greater depth than
others. Block B contains eight lots, four fronting upon
Kamehameha avenue and four upon Punahoa street;
blocks C and D each twenty-four lots, half of which face
on Kamehameha avenue and half on Punahoa street, and
block E twelve lots—one of which, however, lot No. 5,
of an area of 8715 square feet, is not subject to this
appeal being exempt from taxation. The depth of all the
lots in block E is coextensive with the depth of the block.
The four lots in block B facing Kamehameha avenue are
of about the same size and average 8918.5 square feet. Of
the four lots in block B facing on Punahoa street one has
an area of 6740 square feet while the remaining three are
each 9000 square feet. The lots in block C facing on
Kamehameha avenue are also of about the same size, the
average being 6710.4 square feet, while those facing on
Punahoa street have a uniform area of 7000 square feet.
The lots in block D fronting on Kamehameha avenue are
of about the same size and average 7053.08 square feet,
while the lots facing on Punahoa street have a uniform
area of 6500 square feet, except two, which are a little
less and which aggregate 11,465 square feet. All the lots
in blocks B, C and D fronting on Kamehameha avenue
have an average depth of about 140 feet. The lots subject
to taxation in block E aggregate 124,803 square feet. The
lots in block B fronting on Kamehameha avenue aggre-
gate 35,674 square feet; those similarly situated in block
C 80,525 square feet and those in block D 84,637 square
feet. The aggregate area of all the lots in these same

blocks fronting on Punahoa street is 194,205 square feet. The entire tract is subject to lease, there being forty-three leases. Some of these leases demise but one lot, some include both front and rear lots but in all instances the leases are based upon the lot subdivisions. The land is used variously by the different tenants, most of whom are Orientals. Those whose lots front on Kamehemaha avenue have erected in most cases two-story buildings and use the ground floor for stores and the upper floor for living quarters. The rear facing Punahoa street is used for apartment purposes. There are some cottages. It is used mainly for residential purposes and the buildings are of more or less cheap construction. In the case of twenty-three old leases and one new lease (the terms "old" and "new" leases being hereinafter more particularly explained) the improvements revert to the lessee upon the expiration of the leases. In three old leases and sixteen new leases the improvements revert to the lessor.

The taxpayer pursuant to the provisions of section 1253, R. L. 1915, made a return upon a form entitled "Lessor's Return of Real Property Leased" and therein detailed the royal patent, grant or land commission award in which the land subject to each lease was included, the date, term, annual rental and name of the lessee in each lease, and a description of the premises demised by lot and block number and area. The cash value of each piece of property subject to the respective leases was set forth separately. These separate values aggregated $125,693. This averages 24.2c plus per square foot throughout the tract.

The assessor raised the assessment in each individual case, resulting in an aggregate assessment of $258,266. This averages 49.6c plus per square foot throughout. The taxpayer appealed from the assessment as a whole. No claim was made by the Territory either before the tax

appeal court or this court that the appeal of the taxpayer was not in proper form. The tax appeal court sustained the tax assessor and the cause is now before this court upon appeal from the judgment of the tax appeal court.

The return of the taxpayer, according to the evidence of Mr. Collins who has been manager of the estate for a period of about five years, was upon a valuation of 40c a square foot for the frontage on Kamehameha avenue to a depth of 100 feet, 20c a square foot on the balance of the front lots and 10c a square foot on the lots facing Punahoa street. In his opinion the return constituted a fair valuation of the premises. The record is silent as to the value of the rear of block E but classifying it with Punahoa street lots we have as a result of the method pursued by the taxpayer 211,089 square feet at 40c; 56,747 square feet at 20c and 252,008 square feet at 10c, aggregating $120,985. If the value of block E were computed on the basis of 40c per square foot for a depth of 100 feet, 20c per square foot for an additional depth of 40 feet (corresponding to the average depth of lots fronting on Kamehameha avenue in the other blocks) and 10c for the remainder in the rear, the valuation of the property would be increased to $123,754.66. As said the return was $125,693. The net annual rental from the property is $5638, which figures a little less than 4½% net on the value returned for assessment. Mr. Collins testified that the estate usually expects a net rental of 6% and the rentals were figured on that basis, being the highest rental obtainable—as put by him, "the most the traffic would bear."

There are twenty-six "old leases," so called, dating as far back as 1906, one of which expired in 1922; four of which will expire in 1923, eight in 1924, six in 1925, two in 1926, two in 1928, one in 1930 and two in 1936. All of these leases were for terms of fifteen years with the

exception of those expiring in 1936, which were for thirty years.   These leases involve an area of 320,648 square feet, which is 61.66% of the area of the land involved in this appeal, and net an annual rental of $1045.   The respective rentals were based on a 6% net return upon the valuation obtaining at the time of their execution.   The net annual rental accruing from the old leases nets 6% on an average valuation of a trifle less than 5½c a square foot.

Within two and one-half years prior to the taxation period (to be exact, beginning May 1, 1919,) the estate has granted seventeen leases, which will be hereafter referred to as "new leases," each for a term of fifteen years with rentals based on a net 6% return upon a valuation of 40c per square foot for lots fronting on Kamehameha avenue to a depth of 100 feet; the balance of the front lots at 20c per square foot and the lots fronting on Punahoa street at 10c per square foot, the same basis as the return for taxation.   Mr. Collins testified that all further leases would be made upon a valuation of 50c a square foot for the front lots and 25c a square foot for the rear lots.   From the tax return and from the itemized statement, filed by the taxpayer in this court upon appeal, of the number, date, date of expiration, area and rental of the twenty-six old leases referred to it would appear that the rental of old leases of lots on Kamehameha avenue in blocks B, C and D is 6% on from 33c to 35c per square foot, according to location, while the rental of lots facing on Punahoa street is 6% on a valuation of 10c a square foot.  The rental reserved in both the new and the old leases of lots in block E is 6% on from 28c to 31c a square foot, according to the location.

I deem the arbitary subdivision made by the taxpayer for classifying the land for taxation purposes, if of any value, to be inapplicable to lots 1, 2, 3 and 4 in block E.

By reason of their frontage upon Kamehameha avenue and the Wailoa river they of necessity fall into a class by themselves.  Moreover, lack of access to the rear of the remaining lots in block E renders such a subdivision of doubtful value.  The conclusion I here reach, however, renders a consideration of the physical conditions of block E unnecessary.

It would seem that for taxation purposes classification of the lots as subdivided by the taxpayer would be the most reasonable basis of valuation of the tract as a whole.

Land subject to old leases was returned at $71,480; that subject to new leases at $54,213.

The tax assessor assessed the property at 59c plus per square foot for Kamehameha avenue lots in blocks B, C and D, 49c per square foot in block E and 40c a square foot for all lots facing on Punahoa street.  This would average 49.6c plus per square foot throughout the tract. He justified his assessment by evidence of several sales made in the vicinity—an unimproved lot situate on Kamehameha avenue on the Waiakea side of the Volcano Stables with a frontage of approximately 120 feet and a depth of 100 feet and containing an area of 12,000 square feet sold at private sale for $12,000, or $1 a square foot; an unimproved lot situate on the Waiakea corner of Kamehameha avenue and Piopio street with a frontage of 100 feet and a depth of approximately 100 feet and containing an area of 10,367 square feet sold at private sale for $6000, or 58c a square foot; an unimproved lot situate on Kamehameha avenue between the Volcano Stables and Piopio street with a frontage of 90 feet and an approximate depth of 100 feet and containing an area of 9646 square feet sold at public auction for $7,800, or 80c a square foot, and finally three unimproved lots situate in Waiakea on the east side of the proposed Lihiwai street and the north side of the proposed Kuhio street, generally

described as "across the river and diagonally opposite the Honolulu Iron Works," which occupy the easterly corner of block E, aggregating 10,478 square feet, sold for $27,000, or at a rate of $2.67 a square foot. The tax assessor also introduced evidence to the effect that that portion of the tract fronting on Kamehameha avenue and to a depth of 100 feet was worth 60c and that the entire tract as a whole was worth 50c. The two witnesses giving this opinion, however, did not pretend to have any knowledge of the existing leases and the tax assessor, while admitting that the leases were a "consideration," stated that he did not "consider them seriously" in making the assessment. The land subject to the old leases was assessed at $150,200; that subject to the new leases at $108,066. The net annual rental from the entire tract is but 2.18% upon the assessment of the tax assessor.

The evidence was undisputed that a reasonable return upon a real estate investment was 8% net.

From all the evidence in the case I am inclined to feel that the leases provide the safest method of computation of the cash value of the property at the taxation period. The evidence of sales of land made in the immediate vicinity within a reasonable time prior to the taxation period was perhaps of some value to the tax appeal court due to the fact that it was presumably acquainted with the conditions obtaining at the times of the respective sales and had a knowledge of the general situation and the character of the land subject to these sales with which it could make comparisons and drew upon that acquaintance and knowledge in coming to its conclusion. But the record is so meager it is impossible to determine therefrom to what extent these specific sales may be employed in determining the value of the land subject to assessment. Nothing further appears than the mere location except in the case of one sale where it appears that

the property was to be used as a site for a bakery, and another that "it was nearer the business center." Reference was made to the traffic on Kamehameha avenue and Piopio street. No elements, however, of similarity or comparison were shown and it is impossible to concede any value whatever to the evidence. It is a matter of common knowledge that land in an adjoining block very often is of greater or less value due to location, surrounding conditions and the use to which the same may be put. It is significant that the one piece which sold at $1 per square foot was assessed at 50c a square foot and the land of the American Factors on the same side of Kamehameha avenue and immediately adjoining was assessed at a like amount. According to the undisputed evidence the rental reserved under the new leases was computed on a 6% basis and that is the best rental procurable. Figured on a 6% basis the cash value of the lots in blocks B, C and D fronting on Kamehameha avenue and subject to new leases is from about 33c to 35c a square foot while the cash value of those subject to the old leases is from 20c to 22c per square foot. There are only two new leases of lots in block E and a 6% valuation of the land subject to these leases figures at 28c and 29c a square foot respectively.

Opinions of those qualified to speak are of great assistance to a court in determining values. But it must appear that the opinion of the expert is based upon knowledge of the facts involved. None of the witnesses who gave evidence, with the possible exception of Mr. Collins, had any knowledge of the details of existing leases and their evidence was based practically upon the theory of unencumbered ownership in fee. In the instant case, however, there is present evidence of value based upon actualities. The new leases by reason of their number and similarity of land demised remove the question of

value from the realm of opinion evidence.  The rents re-
served are the rental value in the open market of the lands
subject to the respective leases.  They are regulated by
supply and demand.  They are what tenants are willing
to pay and the taxpayer to receive.  It is evidence of
value of a high order and, considered in the light of the
undisputed evidence that the investing public would ex-
pect a net return of at least 8% from this character of
investment, furnishes the best and safest method of com-
putation that the case affords.  I feel that the cash value
at the taxation period of all lots subject to the new leases
should be determined by capitalizing the annual rental on
a basis of 8%.  This would result in a raise in the assess-
ment in some instances in excess of the return of the tax-
payer, but not in all.  In some cases the return of the tax-
payer of property subject to new leases is in excess of the
aggregate capitalization of the annual rentals at a rate of
8%.  The taxpayer returned the land subject to the new
leases at $54,213.  The rentals from the new leases capi-
talized at 8% would amount to only $52,891.61.  Under
the circumstances the return of the taxpayer in all cases
in which the property is subject to new leases must be
sustained.

Nor should the return of the taxpayer upon lands sub-
ject to old leases be disturbed.  The old leases by reason
of the inadequacy of rent and the return which the ordi-
nary investor would expect to receive from the land sub-
ject thereto at the taxation period constitute an encum-
brance and serve to reduce the value of the property sub-
ject to such leases.  For instance, lease 1260 is of two lots
in block B, one fronting on Kamehameha avenue, size
50 ft. x 162½ ft., and one fronting on Punahoa street
containing an area of 6740 square feet.  Were the Bishop
Estate receiving a return similar to what it now receives
under its new leases it would receive $228 per annum.  The

rent it is actually receiving is $50. Another instance is lease 1349 of lot 6 in block C fronting on Kamehameha avenue, approximately 50 ft. x 137.5 ft. Under the rentals prevailing in the new leases the estate would be entitled to receive $142 per annum. The rental it receives under its old lease is $25 per year. This situation obtains pretty generally throughout the old leases. The rent accruing from old leases capitalized at 8%, without reference to expiration dates, would show a value of only $13,062.50. The land subject to the old leases was returned at $71,840 and assessed at $150,200. Where it appears that the rentals reserved in unexpired long-term leases are inadequate and are below the rentals prevailing at the taxation period upon similar lands the cash value of the lands subject to such leases should be determined in the light of such prevailing rentals and an allowance made to the extent that the investing public would demand by reason of their inadequacy. From such calculation as I have been able to make, of the actual "present worth" at the taxation period of the lands subject to the old leases, it would appear that it is less than the respective amounts actually returned. Under the circumstances I am of the opinion that the valuation placed by the taxpayer upon the several lots subject to the old leases is fair and reasonable and represents their cash value at the taxation period.

There are further reasons why the return of the taxpayer of the lots in block E should be sustained. The evidence of values adduced by the taxpayer, if intended to apply to block E, left the value of the rear portion in doubt. Nor did the tax assessor clarify the issues in that regard. The evidence adduced by the latter absolutely failed to take into consideration existing leases. Hence here similarly, as in the case of the lots in the other blocks, one must be guided by the existing leases, both new and old. Two new leases were secured in May,

1919,—No. 2237 covering lot 1, containing 13,536 square feet, and lease No. 2238 covering lot 4, containing 10,305 square feet, each at a rental of $300 per annum. Both lots have a frontage on the Wailoa river which should render them more valuable than those in the same block which adjoin the government land intervening between the rear of block E and the river. Capitalizing this rent at the rate of 8% each lot would be worth $3750. The land subject to lease 2237 was returned at $3805 and that subject to No. 2238 at $3060 or 28.1c and 29.6c per square foot respectively. Lots 2 and 3 also border on the Wailoa river but are subject to old leases. The area remaining in block E, after excluding lots 1 and 4— 100,962 square feet,—notwithstanding it earns but an aggregate annual rental of $550, which if capitalized at 8% would show a value of only $6875, was nevertheless returned by the taxpayer at $30,390 or 30c per square foot, a cent plus per square foot in excess of the average value per square foot under the new leases.

There remains still to be considered the extent to which the assessment should be affected, if at all, by the value of the improvements upon the premises at the taxation period. The evidence is that the improvements were assessed separately against the lessees. Neither party offered any evidence of what the improvements consisted which were upon the premises subject to leases which revert to the lessor at the expiration of the term, which obviously are the only improvements with which we are concerned. The only evidence of improvements is that hereinbefore set forth in connection with the uses to which all the premises generally were devoted. Neither the return of the taxpayer nor the assessment of the assessor contains any reference to improvements. This matter seems to have been an afterthought of the tax appeal court and to have been considered by it in the absence of

any evidence on the subject. No effort was made to identify any particular improvements as upon any particular lot or its value in whole or in part. In the absence of evidence it is obviously impossible to make any finding on the subject. This is but another instance in which the tax appeal court evidently drew upon the personal knowledge of its members. Their undisclosed personal knowledge, however, is not a substitute for evidence. Without going into the degree of proof necessary the record must disclose at least some evidence to sustain a finding, otherwise the finding falls. Under the circumstances the value, if any, of improvements upon premises subject to leases containing a provision that improvements at the expiration of the term revert to the lessor cannot be considered.

I concur in the conclusion reached by the majority.