This case comes here on appeal from a decision rendered by the tax appeal court of the Territory. The appellants, the trustees of the estate of Bernice P. Bishop, deceased, are, and for many years past have been, the owners of a tract of unoccupied and unimproved real property containing 163,383 square feet and bounded on one side by Ala Moana and on the other by the Honolulu Harbor and lying between the premises of the Inter-Island Steam Navigation Company and property occupied by the United States lighthouse service, in the city of Honolulu. Of this area 88,895 square feet are under water measured from high watermark and 74,488 square feet are above high watermark. The portion of the land described as being submerged is covered by shallow water near the water line which tapers downward to an estimated depth of thirty-five feet. The owners made a written return of the property in question as of January 1, 1933, but refrained from fixing any value thereon in accordance with Act 40, 2d Sp. *Page 151 
S.L. 1932. In due course the property was assessed by the tax assessor of the first taxation division, who fixed the value of the property at $176,440. From this assessment the owners perfected an appeal to the tax appeal court of the Territory and in their notice claimed the value of the property to be $46,006. The cause was thereafter heard by the tax appeal court, oral and documentary evidence being introduced by both the appellants and the Territory. At the conclusion of the hearing the tax appeal court rendered a lengthy decision, placing the fair and reasonable value of the property as of January 1, 1933, at the sum of $101,398.75, and ordered the assessment list to be amended accordingly. From this decision the owners have perfected an appeal to this court pursuant to statute, the taxpayers urging in their appeal that the value of the property fixed by the tax appeal court is excessive and is not supported by the evidence.
Under the law heretofore existing, namely, chapter 102, R.L. 1925, real and personal property within the Territory was required to be assessed on the basis of its "full cash value" (see § 1315). The more recent legislation on the subject enacted by the territorial legislature (see § 21, Act 40, 2d Sp. S.L. 1932) provides: "Real property tax. Except as exempted or otherwise taxed, all real property in each taxation division of the Territory shall be subject each year to a tax of such rate per cent as shall be determined in the manner provided in this section upon its fair and reasonable value." As hereinafter explained we regard as unimportant the adoption in the new statute of the phrase "fair and reasonable value" instead of "full cash value." Section 26 of Act 40 provides in part: "In making all assessments of land consideration shall be given to the advantage or disadvantage of location, accessibility, transportation facilities, size, shape, topography, quality of soil, water privileges, availability of water and *Page 152 
its cost, easements and appurtenances, productivity and nature of use, and further to selling prices, and to the opinions of persons who may be considered to have special knowledge of land values, and further to all other influences whether similar to those listed or not, which fairly and reasonably bear upon the question of value."
The legislature may have intended otherwise but after careful consideration and the investigation of the authorities we conclude that the expressions "full cash value" and "fair and reasonable value" are terms of like import and denote the price in cash which a capable and diligent man could obtain for it as distinguished from the sacrifice price on the one hand and the credit price on the other. Cash is the antonym of credit. The authorities uniformly hold that the terms "value," "market value," "fair value," "reasonable value," "fair cash value," "actual cash value" and "fair and reasonable cash value" are synonymous expressions. 4 Words Phrases (2d Ser.) 1137-1142. See also State v. Woodward, 208 Ala. 31; Sisk v. AmericanCentral Fire Ins. Co., 69 S.W. (Mo.) 687. In Stern v. Paper,
183 Fed. 228, 231, the court in defining "fair value" made use of the following language: "Such a value excludes, on the one hand, the sacrifice price that would result from an execution or foreclosure sale, and, on the other hand, the retail price that could be realized in the slow process of trade. * * * `Fair valuation' means such a price as a capable and diligent business man could presently obtain for the property." While the court in that case was dealing with a stock of merchandise yet we think its definition of "fair valuation" is equally applicable in the present case.
The supreme court of Hawaii has on divers occasions, in dealing with chapter 102, R.L. 1925, endeavored to define the term "full cash value." We quote from a few of the local decisions: "The cash value of property at a given *Page 153 
time is determined by what people then believe it to be worth."Tax Assessment Appeals, 11 Haw. 235, 241. "`Full cash value' under the tax law means the value for purposes of sale, if the property is salable, and not either the value to the owner or the cost of reproduction." In re Taxes Castle, 15 Haw. 1. See alsoKash Co. v. Assessor, 15 Haw. 476. "The term `cash value,' as used in the tax statute, means the highest price which the property will bring for cash on the assessment date whether sold as a whole or in lots, — whichever will bring the higher return — and after reasonable advertisement. It means the cash price obtainable if all the property were sold on the assessment date." Re Taxes Bishop Estate, 27 Haw. 190.
The new statute is more comprehensive than the old in that it prescribes in more detail the formula to be employed to determine real property values. Act 40, 2d Sp. S.L. 1932, requires that in ascertaining the fair and reasonable value of real property many factors must be taken into consideration, namely, location, accessibility, transportation facilities, size, shape, topography, quality of soil, water privileges, availability of water and its cost, easements and appurtenances, productivity and nature of use, the opinions of persons who may be considered to have special knowledge of land values and all other influences, whether similar to those listed or not, which fairly and reasonably bear upon the question of value. What is the fair and reasonable value of a piece of property, therefore, becomes a question which can only be solved by the consideration of the facts of each case so variant are the circumstances under which this question arises.
In the present case the land involved is conceded by all parties to enjoy a frontage on the harbor of Honolulu of 307.2 feet and a frontage of 331.2 feet on Ala Moana and this is an advantage of location which we hold should not be overlooked in arriving at the fair and reasonable value *Page 154 
of the property. While the taxpayers contend that the premises should be appraised as industrial property and no importance should attach to the fact that the same is harbor frontage, we are unable to concur in this view. It seems plain to us that the property has an advantage of location far beyond that of strictly industrial property. This is supported by an overwhelming preponderance of the testimony of the witnesses, including the testimony of the witness Watson who appeared before the tax appeal court in behalf of the taxpayers. This witness in answer to a question propounded by one of the members of the tax appeal court, who was endeavoring to ascertain from the witness whether an exchange of the land involved for other industrial property of like area but noncontiguous to the harbor front would be a fair and reasonable one, gave the following answer: "Q * * * Mr. Watson, * * * assuming that the possibility of leasing both properties were approximately the same chance, do you think that an exchange of this property for this other property would be a fair and reasonable exchange? A No, I don't. Q Which do you think would be the better? A The Bishop estate property. The fact thatit is on the harbor is inescapable." Campbell Crozier, deputy tax commissioner of the Territory, a witness qualified as an expert on real estate values in Honolulu and called by the government, testified in part as follows: "Q And that is, from your standpoint as tax assessor, its value would be for harbor development, docks, wharves and piers and things of that sort? AOne of the factors entering into value is its harbor frontenvironment, harbor front frontage." And again, Lyman H. Bigelow, chairman of the territorial board of harbor commissioners and territorial superintendent of public works, a witness called by the government, referring to a plan to improve the harbor of Honolulu and include within such project the property in question, gave *Page 155 
the following evidence: "Q But you think that a project contemplating the development of this land should logically come along in a not too far distant future? A I think so. Q Now it has been suggested and stated on the witness stand before this court, Mr. Bigelow, that this property has no taxable value by virtue of the fact that it is on the water-front. Do you or do you not subscribe to such a statement, or point of view? A I do not. Q You feel that there is a taxable value in this property by virtue of the fact that it is on the water-front? A I do now, especially due to this federal development that makes it useful."
While it is clear that in order to make full use of the property in question so the same may accommodate ships of large tonnage it would be necessary to utilize adjacent premises, yet without any such additional property the lot in question is of sufficient size so that it could be devoted to docks, slips, etc., for the convenient accommodation of vessels of limited size such as are plying in interisland trade. It is notorious that the water-front area surrounding the harbor of Honolulu is of limited extent and it is also of universal recognition that the port of Honolulu is increasing in importance from a shipping standpoint and that ships calling are gradually being increased in dimensions and tonnage. Mr. Bigelow made these facts clear in the testimony given by him before the tax appeal court. In the light of all of the evidence we are convinced that the advantages of location of the property on the water front of the harbor of Honolulu add substantially to its value. This is a factor which the statute requires the taxing authorities to take into consideration in ascertaining the value of the land for taxation purposes.
The fact that the taxpayers fixed a selling price upon the property prior to the taxation date has in our opinion important bearing upon the question of value. The record *Page 156 
before us shows that in December, 1930, the trustees of the Bishop estate employed three local realtors, namely, O'Connor, Steer and Hoogs, to appraise the property. This appraisal was evidently sought for the purpose of using the same as the basis of an offer then in contemplation to dispose of the property to the territorial government for harbor development purposes. The report of these appraisers fixed the value of the property at $367,611.75 and shortly following, to-wit, on May 11, 1931, the trustees by letter addressed to the territorial board of harbor commissioners expressed a willingness to grant the Territory a lease of the property for two years at the annual rental of one dollar net above taxes, with an option to purchase within the period for the sum fixed by the appraisers, to-wit, $367,611.75. The board of harbor commissioners, through its chairman, declined the offer thus made on the ground that the Territory was without sufficient funds at that time to acquire the property, and adjacent property, and the additional funds necessary for the construction of facilities the total of which would entail a very large expenditure. The trustees again caused the property to be appraised by a board of realty experts on December 2, 1932, who reported a value at that time of $220,567.05. This appraisal was evidently obtained for the purpose of using the same in connection with a tax appeal case then pending involving the property. Upon receipt of this latter appraisal and within a week thereof the trustees directed the board of appraisers to reappraise the property but in making the appraisement to assume that the lot possessed no value for water-front purposes. Complying with these instructions the appraisers on December 8, 1932, reported a value of $45,525. There is no evidence in the record to indicate in the slightest degree that the trustees were willing at any time to accept less for the property than the amount of their offer of May 11, 1931, *Page 157 
to-wit, the sum of $367,611.75, nor is there any indication that had that figure been substantially reduced a ready sale could not have been consummated. There is no indication that any wide variance in the prices obtainable for local real estate existed between May 11, 1931, and January 1, 1933. The financial and industrial panic became nation wide during the fall of 1929, causing a sharp decline in the prices of almost all commodities including real estate. The slump in local real estate had already taken place long prior to May, 1931. Real estate values had not fluctuated to any great extent between May, 1931, and January 1, 1933. If it could be fairly contended that the property had depreciated materially within that period yet the difference between the selling price fixed by the taxpayers in May, 1931 and the sum at which the tax appeal court appraised the value of the property as of January 1, 1933, is so great as to more than offset any possible decline in value which could have taken place within the intervening space of time.
We are not at all impressed by the logic of the contention that merely because the Territory did not accept the single offer of the owners to sell the property for $367,611.75, by some magic all values between that figure and $45,525 promptly vanished. The probative value of the testimony given by experts testifying in behalf of the taxpayers on the question of values is greatly weakened if not totally destroyed because these witnesses proceeded upon the false assumption that the property enjoys no advantages of location because of its harbor frontage. This was the attitude of both witnesses Watson and Steere. Mr. Watson did, however, finally admit that a person endeavoring to arrive at the fair and reasonable value of the property would not be justified in disregarding its water-front potentialities. The attitude of the board of appraisers is explained in the testimony of both Steere and Hoogs. Mr. *Page 158 
Steere testified: "Q So that your opinion is wholly confined to the use to which the owners have stated as being the best use to which the property could be put? A Yes, I think it is, it is rather common knowledge among realtors that going back beyond 1932, that that was considered as water-front property and I think that any realtor sent down there, or any number of realtors, to appraise it would so appraise it." And again the same witness further testified: "Q Mr. Steere, do you know of any other piece of property on the water-front that has no water-front value? A I don't know of any piece of property on the water-front that has no water-front value. Q Except this piece? A I don't say that this has not. Q I thought you said that this one had not? A I said we were asked to appraise it as if it had no water-front value, and that is what we did. I am not saying that it has not a water-front value." Hoogs, another of the appraisers, testified that he considered the instructions given to the appraisers by the trustees to disregard harbor frontage values of the property as unusual. The evidence given by witness O'Connor, the third appraiser, should carry little weight in view of his admission on the witness stand that he did not know which of the several appraisals in which he participated was correct. It ought to be unnecessary to say that a landowner conscientiously desiring to ascertain the fair value of his property for any purpose may not require the appraisers of the property to disregard any factor either adding to or detracting from its value.
Coming then to the testimony of values offered by the Territory we find as outstanding that of Campbell Crozier, who estimated the market value of the lot to be $2.16 per square foot. He explained how this figure was reduced by the tax officials so that the final figure arrived at was one-half of the market value, namely, $1.08 per square foot, which he considered a fair and reasonable value to be *Page 159 
placed on the property for tax purposes. This testimony of a reputable expert on local realty values of more than twenty years' experience, taken together with the other evidence in the case bearing upon the subject, is ample to sustain the decision of the tax appeal court in fixing the value of the property of appellants at $101,398.75 as of January 1, 1933.
Reference has been made by appellants to the fact that the tax board of equalization of the Territory in the year 1932 fixed the value of this property as of January 1, 1932, at the sum of $43,006. And they cite the rule that prior assessments should not be lightly overturned. Doubtless many other instances could also be brought to light where certain property owners in the Territory have in the past, through negligence, incompetence or gross favoritism of tax officials, escaped their just tax burdens and the knowledge of this fact may well be assigned as one of the abuses which the legislature of the Territory was endeavoring to remedy when in 1932 it not only abolished the board of equalization but enacted other drastic changes in the property tax laws of the Territory.
The tax appeal court after having heard and observed the witnesses rendered its decision reviewing the facts and by an intricate process of reasoning reduced the value of the land fixed by the assessor as of January 1, 1933, from $176,440 to $101,398.75. The evidence in our opinion amply sustains that figure. The court has on numerous occasions announced the rule to be that the findings of a tax appeal court are entitled to great weight; that where such findings depend upon the credibility of witnesses and upon the weight of conflicting statements of witnesses, such findings are to be accorded the same weight as the findings of a circuit judge at chambers. (See Tax AssessmentAppeals, 11 Haw. 235; Hawi Mill Plantation Co. v. Forrest,21 Haw. 389.) In the Hawi Mill *Page 160 Plantation Co. case this court expressly likened tax appeals to equity appeals.
"The decision of the tax appeal court fixing the value of property will be sustained unless shown to have been erroneous, and the burden of proof is upon the appellant." Re TaxesCastle, 24 Haw. 598. (See also Hawi Mill Plantation Co. v.Forrest, supra; Lihue Plantation Co. v. Farley, 13 Haw. 283.) Indeed, under the new law the tax appeal court has been raised to the dignity and importance of a court of record, clothed within the sphere of its duties and functions with all the power and authority of a circuit judge at chambers. (See §§ 43, 48, Act 40, 2d Sp. S.L. 1932.)
The decision of the tax appeal court made and entered herein is affirmed and the appeal is dismissed.